# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| **KERRI SANBORN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | |
| **ACTS RETIREMENT-LIFE** | ) | **1:26-cv-00126-C** |
| **COMMUNITIES, INC.** *d/b/a* | ) | |
| **WESTMINSTER VILLAGE,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

## COMPLAINT

### I.   INTRODUCTION

1. This action alleges violations of Title I of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. 12101, *et. seq.* The plaintiff is an individual with a disability and a history of disability. The defendant violated the ADA when it failed to accommodate the plaintiff's disability and discriminated against her and retaliated against her for engaging in protected activity when it terminated her employment. The plaintiff seeks declaratory and injunctive relief, equitable relief, including reinstatement, back pay, and front pay, compensatory, liquidated, punitive and/or nominal damages, and reasonable attorneys' fees and costs.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction in accordance with 28 U.S.C. §§ 1331, 1343, 2201, and 2201 and 42 U.S.C. § 12101.

3.    Venue is proper pursuant to 28 U.S.C. § 1391. The unlawful employment practices alleged occurred within Baldwin County, Alabama which is located in the United States District Court for the Southern District of Alabama–Mobile Division.

## III.    PARTIES

4.    Plaintiff Kerri Sanborn ("Sanborn" or "plaintiff") is an individual over the age of 19 years and a resident of Baldwin County, Alabama. The plaintiff was qualified to perform her job with the defendant and was employed by the defendant in Baldwin County, Alabama.

5.    Defendant Acts Retirement-Life Communities, Inc. *d/b/a* Westminster Village ("Acts", "Westminster Village" or "defendant") is an "employer" as defined under the ADA and is required to comply with that statute. The defendant conducts business in Baldwin County, Alabama and during the relevant period had more than fifteen (15) employees.

## IV.    ADMINISTRATIVE EXHAUSTION

6.    The plaintiff fulfilled all conditions precedent to the institution of this action under Title I of the ADA.

2

7. The plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 13, 2024, which was within 180 days of the occurrence of the last discriminatory act. (Exhibit 1). The plaintiff's charge alleged discrimination and retaliation in violation of the ADA.

8. The EEOC issued the plaintiff Notice of Right to Sue on January 12, 2026, and the plaintiff timely filed this Complaint within 90 days of receipt. (Exhibit 2).

IV. **STATEMENT OF FACTUAL ALLEGATIONS**

9. Sanford was employed by Acts Retirement-Life Communities, Inc. as Senior Manager of Community Sales and Marketing for its Westminster Village location from December 2022 until it terminated her on or about October 11, 2024.

10. Acts is a Pennsylvania corporation which operates retirement communities at various locations in the United States.

11. Westminster Village, located in Spanish Fort, Alabama, is one of the retirement communities Acts owns and operates.

12. During the relevant time, Acts employed Megan Longley as Vice-President of Sales, Christy Andrus as Southeast Regional Director of Sales, and Kimberly Burke as Corporate National Sales Director.

13. Longley, Andrus, and Burke interviewed Sanborn for the position of Senior Manager of Community Sales and Marketing of Westminster Village in Spanish Fort, Alabama.

14. During the interview, Sanborn told Longley, Andrus, and Burke that she was a cancer survivor.

15. Sanborn explained that she had been diagnosed with cancer in March 2018 and had completed a year-long chemotherapy regimen which caused her post-traumatic stress disorder (PTSD).

16. Sanborn explained that cancer had threatened her life and her health was a priority.

17. They also discussed Sanborn's experience and her ability to do the job.

18. After the interview, Acts hired Sanborn for the position.

19. As Senior Manager, Sanborn's job was to oversee marketing and sales of units at its Westminster Village location.

20. Sanborn directly supervised two Life Care Consultants ("LCC"), Ray Clark and Christopher Fowler, and Sales Manager Chris Thomas.

21. Clark was a long-time employee at Westminster Village and throughout Sanborn's employment worked four (4) days per week and worked remotely.

22. Sanborn was a loyal and dedicated employee. Acts had never disciplined Sanborn prior to her request for accommodation of her disability.

23. Sanborn was open with her supervisors about her cancer treatment, her PTSD, and her need to maintain an appropriate work-life balance in order to continue to recover from the physical and emotional trauma she had suffered.

24. Sanborn had numerous conversations with her direct supervisor, Mid-South Regional Sales Director Patti Graham, about her recovery from cancer and her PTSD.

25. Acts increased Sanborn's base compensation at the beginning of 2024 due to her outstanding performance, hard work, and positive results.

26. During early 2024, Acts also terminated Fowler, so that one of the LCC positions was vacant during much of that year.

27. During August 2024, Sanborn asked Graham for permission to work remotely for three (3) days in October 2024.

28. Sanborn explained that she had to travel, which was tiring due to her existing health conditions, and felt she could get more work done if she was permitted to work remotely.

29. Graham told Sanborn that she was not permitted to work remotely.

30. At the time, Acts had not yet filled the vacant LCC position and was in the process of interviewing candidates.

31. On September 7, 2024, Sanborn emailed Graham, Longley, and Burke explained that she needed accommodation of her health concerns related to her cancer treatment and suffered from PTSD.

32. Sanborn expressed interest in the vacant LCC position and explained she wanted to work remotely four (4) days per week, which was the same schedule Clark worked.

33. Sanborn was qualified for the vacant LCC position.

34. Sanborn had never been counseled or disciplined prior to this time.

35. On September 10, 2024, Graham text messaged Sanborn and told her to report to the office of Westminster Village Executive Director Joseph Meadows for a meeting. Meadows was in his office with Sanborn but Graham attended the meeting virtually.

36. During the meeting, Graham emailed Sanborn a document which was styled as an "Expectation Memo." The document was incorrectly dated September 5, 2024, because it was first provided to Sanborn on September 10, 2024.

37. The "Expectation Memo" contained several factual errors and threatened Sanborn with termination if she did not meet the expectations outlined in the memo.

38. After the meeting, Sanborn sent Graham a copy of the "Westminster Village – USC 2024 Goal Worksheet", which reflected that Sanborn met the sales

goals Acts set for her and demonstrated that Graham's "Expectation Letter" was based on false premises. Thus, Graham either: (1) did not know what Sanborn's sales goals were when she wrote the letter or (2) intentionally misrepresented the facts.

39. For example, the first bullet point in the "Expectation Letter" incorrectly alleged that Sanborn had not met her sales goals, whereas the numbers Graham reported reflected that Sanborn had exceeded the sales goals Acts set for her.

40. Acts set the sales goal for the Senior Manager at 8 sales per year. Graham credited Sanborn with 7 sales by the end of August, so Sanborn was ahead of the pace for her annual goal and only one sale short of the annual goal.

41. Both Clark and Fowler failed to meet their sales goals but were not provided with expectations letters and were not terminated for their failure to meet their sales goals.

42. Clark continued to work for Acts after Sanborn was terminated.

43. Acts terminated Fowler for improper conduct that was not related to his failure to meet his sales goal.

44. After Sanborn demonstrated that the "Expectation Memo" was factually incorrect, Graham never again mentioned the "Expectation Memo" or the false allegation that Sanborn failed to meet her sales goal.

45.    Instead, Acts stated new rationales for its decision to terminate Sanborn, both of which were false.

46.    On September 20, 2024, Hardy called Sanborn and told her that she was suspended without pay and under investigation for mismanagement of company funds and providing misinformation to prospects.

47.    The new allegations were false and based on incidents that occurred several months prior to Sanborn's request for accommodation and both of which Acts failed to mention at the time.

48.    On September 23, 2024, Graham and Hardy called Sanborn and provided her with a more detailed rationale for her suspension.

49.    Hardy falsely alleged that Sanborn had improperly progressed two resident prospects, Judy and Bruce Lorenz, through unit selection procedures and incorrectly told them that a change in unit selection was possible.

50.    Hardy falsely alleged that Sanborn had improperly persuaded a prospect, Gilda Hodges, to move into a unit she did not want.

51.    Sanborn explained that Graham and Hardy were wrong about both issues and that she had not done anything wrong.

52.    Sanborn suggested that they talk to Mr. and Mrs. Lorenz and to Ms. Hodges who would explain what happened in each instance.

53. Sanborn asked Graham and Hardy to allow her to access information that would demonstrate that these allegations were false, including, but not limited to, her email account, her calendar, the contact management system, and Acts' policy and procedure manual.

54. The allegations were false and did not reflect accurately Sanborn's interactions with either Mr. and Mrs. Lorenz or Ms. Hodges.

55. Graham and Hardy refused to give Sanborn access to information which would have permitted her to demonstrate that the allegations against her were blatantly false.

56. Graham and Hardy refused to give Sanborn a copy of the procedures that they alleged she violated.

57. Sanborn asked Graham and Hardy to put the alleged reasons for her suspension in writing.

58. On September 25, 2024, Hardy emailed Sanborn a "Notice of Allegation(s) of Acts Policy Violation" letter, which recited two infractions which Acts alleged were the reasons for her suspension.

59. Graham and Hardy allowed Sanborn less than 48 hours to respond in writing.

60. On September 27, 2024, Sanborn responded in writing but had to do so without access to the information that would have conclusively refuted their allegations. Sanborn complained that the discipline was unjust and

unreasonable based on the allegations. Sanborn noted that she had never attempted to deceive anyone and Act had never disciplined her. Sanborn complained that these were acts of retaliation for her request for accommodation.

61. Sanborn's actions with prospective residents Mr. and Mrs. Lorenz and future resident Ms. Hodges were consistent with the business practices at Westminster Village which Meadows regularly approved.

62. On October 11, 2024, Acts terminated Sanborn's employment. The termination letter included new allegations which were vague and were mentioned to Sanborn during her employment.

63. Sanborn had no opportunity to respond to these new allegations except insofar as she filed charge of discrimination with the EEOC.

64. Both Mr. and Mrs. Lorenz and Ms. Hodges provided Sanborn with sworn statements which demonstrated that the allegations Graham and Hardy made were blatantly false.

65. Mr. and Mrs. Lorenz examined the "Notice of Allegation(s) of Acts Policy Violation" and refuted these allegations.

66. Mr. and Mrs. Lorenz testified that Hardy's allegations were false and defamatory of both of them and Sanborn.

67. Mr. and Mrs. Lorenz also testified that "If the corporate team at Acts Retirement Life Communities had taken any time to investigate this matter at all and given us a call, they would have known that when we signed the contract to move into Cottage 19, we fully desired and fully intended to move into Cottage 19."

68. Ms. Hodges also examined the "Notice of Allegation(s) of Acts Policy Violation" and refuted the allegations in the notice.

69. Ms. Hodges testified that "Ms. Sanborn was professional and represented Westminster Village in an excellent manner.

70. Ms. Hodges also testified that "Ms. Sanborn made it very clear to me that I could withdraw at any time."

71. According to Ms. Hodges' sworn declaration, she changed her unit selection–which is permitted by Acts' policy–and now resides at Westminster Village.

72. Sanborn helped Ms. Hodges become a resident at Westminster Village.

73. Acts declined to rescind its decision to terminate Sanborn even after it was provided with a copy of Sanborn's charge of discrimination and the sworn testimony from Mr. and Mrs. Lorenz and Ms. Hodges which demonstrated that its reasons for terminating Sanborn were false.

**COUNT ONE**
**42 U.S.C. § 12112**
**(Discrimination under the Americans with**
**Disabilities Act: Failure to Accommodate)**

74.    The plaintiff re-alleges and incorporates by the factual allegations set for in paragraphs 1-73 with the same force and effect as if fully set out in specific detail herein below.

75.    Throughout her employment, the plaintiff has been an individual with a "disability" within the meaning of Section 3(2) of the Americans with Disabilities Act, 42 U.S.C. § 12102(2). More particularly, the plaintiff has a mental or physical impairment that substantially limits one or more of her major life activities, has a record of such an impairment, and is regarded by the defendant as having such an impairment.

76.    The plaintiff is a "qualified individual with a disability" as that term is defined in § 101(8) of the ADA, 42 U.S.C. § 12111(8). More specifically, the plaintiff is an individual with a disability who, with reasonable accommodation, can perform the essential functions of her job.

77.    The defendant is a covered entity and an employer in accordance with 42 U.S.C. § 12111(5).

78.    Despite the plaintiff's request, the defendant has refused to make reasonable accommodation to the plaintiff by permitting her to work remotely or by considering her for the vacant LCC position for which she was qualified.

12

79. The defendant's failure to make reasonable accommodation to the plaintiff's mental and physical disability constitutes discrimination against the plaintiff with respect to the terms, conditions, or privileges of employment. The defendant's actions constitute a violation of Section 102(b)(5)(A) of the ADA, 42 U.S.C. § 12112(b)(5)(A).

80. The defendant failed to undertake any good faith efforts, in consultation with the plaintiff, to identify and make reasonable accommodation with the plaintiff.

81. In failing to make reasonable accommodation to the plaintiff's mental and physical disabilities, the defendant acted with malice or with reckless indifference to the federally protected rights of the plaintiff.

82. As a direct and proximate result of the defendant's discrimination on the basis of disability, the plaintiff has suffered lost wages and benefits and lost employment opportunities (termination).

83. The defendant's failure to make reasonable accommodation to the plaintiff has caused, continues to cause, and will cause the plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

**COUNT TWO**
**42 U.S.C. § 12112**
**(Discrimination under the Americans**
**with Disabilities Act: Termination)**

84. The plaintiff re-alleges and incorporates by the factual allegations set for in paragraphs 1-73 with the same force and effect as if fully set out in specific detail herein below.

85. Throughout her employment, the plaintiff has been an individual with a "disability" within the meaning of Section 3(2) of the Americans with Disabilities Act, 42 U.S.C. § 12102(2). More particularly, the plaintiff has a mental or physical impairment that substantially limits one or more of her major life activities, has a record of such an impairment, and is regarded by the defendant as having such an impairment.

86. The plaintiff is a "qualified individual with a disability" as that term is defined in § 101(8) of the ADA, 42 U.S.C. § 12111(8). More specifically, the plaintiff is an individual with a disability who, with reasonable accommodation, can perform the essential functions of her job. The plaintiff is a person with a disability and a history of disability. *See* 42 U.S.C. § 12102.

87. The defendant is a covered entity and an employer in accordance with 42 U.S.C. § 12111(5).

88. Under the ADA, the defendant is prohibited from discriminating against the plaintiff by excluding or otherwise denying equal jobs or benefits to her, a

14

qualified individual, because of the known disability. 42 U.S.C. § 12112(a) and (b)(4).

89. The ADA's protection against discrimination also prohibits utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability. 42 U.S.C. § 12112(b)(3)(A).

90. By terminating the plaintiff and denying her equal benefits, the defendant has maliciously, intentionally, and with reckless disregard discriminated against the plaintiff as a person with disability and a record of disability and has otherwise classified and segregated the plaintiff in a way that has adversely affected her job opportunities because she is a person with a disability and a history of disability. *See* 42 U.S.C. § 12112.

91. Because of such conduct, the plaintiff suffered emotional distress, embarrassment, and humiliation.

92. The defendant's actions were willful, with malice and with reckless disregard for the plaintiff's rights.

## COUNT THREE
## 42 U.S.C. § 12203
### (Discrimination under the Americans with Disabilities Act: Retaliation)

93. The plaintiff re-alleges and incorporates by the factual allegations set for in paragraphs 1-73 with the same force and effect as if fully set out in specific detail herein below.

15

94. The plaintiff engaged in protected activity when she asked the defendant for reasonable accommodation for her disabilities. The plaintiff had numerous conversations with her supervisors about her desire to work from home to some extent due to her physical and mental disabilities, including being willing to take a different position in which remote work was explicitly permitted.

95. The plaintiff engaged in protected activity when she opposed the defendant's refusal to accommodate her disabilities and its retaliation against her for her protected activity.

96. As a direct result of the plaintiff's request for reasonable accommodation and opposition to conduct prohibited by the ADA, the defendant retaliated against the plaintiff by terminating her employment.

97. The defendant treated the plaintiff less favorably than her similarly situated counterparts who did not engage in protected activity.

98. The defendant interfered with the plaintiff in the exercise and enjoyment of her rights under the ADA by terminating the plaintiff's employment.

99. The defendant is liable for the acts and omissions of its agents and employees. The defendant, either directly or by and through its agents, retaliated against the plaintiff and caused her injuries, damages, and losses.

100.  The defendant's retaliatory conduct was the direct and proximate cause of the plaintiff's injuries, damages, and losses.

101.  The defendant's conduct was with malice or reckless indifference to the plaintiff's federally protected rights under the ADA.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in her favor and against the defendant, and grant:

A.    A declaratory judgment that the actions, conduct, and practices of the defendant complained of herein violate the laws of the United States;

B.    An injunction and order permanently restraining the defendant from engaging in such unlawful conduct;

C.    An order directing the defendant to place the plaintiff in the position she would have occupied but for the defendant's discriminatory conduct in violation of the ADA, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect the plaintiff;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate the plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security, and other benefits of employment;

E.      An award of damages for any and all other monetary and non-monetary losses suffered by the plaintiff, including compensatory and consequential damages, damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering, liquidated damages, and nominal damages, on all claims allowed by law in an amount to be determined at trial, plus prejudgment interest;

F.      Punitive damages on all claims allowed by law, in an amount to be determined at trial;

G.      An award of costs that the plaintiff has incurred in this action, as well as the plaintiff's reasonable attorneys' fees to the fullest extent permitted by law;

H.      Pre- and post-judgment interest at the lawful rate; and

I.      Such other and further as the Court may deem just and proper, and any other relief as allowed by law.

## JURY DEMAND

The plaintiff hereby requests a trial by jury on all issues so triable.

Dated: April 9, 2026.

Respectfully submitted,

*/s/ H. Wallace Blizzard*
H. Wallace Blizzard (asb-8969-b59h)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North

18

Birmingham, Alabama 35203
(205) 314-0593 (phone/text)
(205) 314-0793 (facsimile)
wblizzard@wigginschilds.com

**Defendant's Address:**
**Acts Retirement-Life Communities, Inc.**
**c/o Susan D. Doughton, Reg. Agent**
**1130 22nd Street South, Ste. 4000**
**Birmingham, AL 35205**

**PLAINTIFF DEMANDS A TRIAL BYSTRUCK**
**JURY ON ALL ISSUES TRIABLE BY A JURY.**

*/s/ H. Wallace Blizzard*
H. Wallace Blizzard (asb-8969-b59h)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0593 (phone/text)
(205) 314-0793 (facsimile)
wblizzard@wigginschilds.com